## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN BURRIS,** | : | |
| **Plaintiff** | : | **No. 1:21-cv-01923** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **WELTMAN, WEINBERG & REIS,** | : | |
| **CO., L.P.A.,** | : | |
| **Defendant** | : | |

### <u>MEMORANDUM</u>

Plaintiff John Burris ("Plaintiff") brings this action to recover statutory damages, costs, and fees from Defendant Weltman, Weinberg & Reis, Co., L.P.A. ("Defendant"), a debt collector, under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p. (Doc. No. 1-1.)  Plaintiff asserts that Defendant violated § 1692c(b) of the FDCPA by providing his debt-related information to a third-party mail vendor, which prepared and mailed him a dunning letter on Defendant's behalf.  <u>See</u> § 1692c(b) (prohibiting communications with third parties "in connection with the collection of any debt," with exceptions).  Arguing that its use of the vendor did not violate the FDCPA, Defendant moves for judgment on the pleadings in its favor.  (Doc. No. 10.)  Because Plaintiff lacks standing to pursue his claim, the Court will remand this case to state court and deny Defendant's motion as moot.

### I. BACKGROUND[1]

In January 2021, Plaintiff received a letter from Defendant stating that one of his bank accounts was delinquent and had been placed with Defendant for collection.  (Doc. No. 1-1 ¶ 17; <u>id.</u> at 9.)  Defendant did not itself prepare and mail the letter.  (<u>Id.</u> ¶ 18.)  Rather, without

---

[1]  This background is drawn from the allegations in Plaintiff's complaint, which the Court has accepted as true, and the exhibit attached to his complaint.  <u>See</u> <u>Pension Ben. Guar. Corp. v.</u> <u>White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

Plaintiff's consent, Defendant provided a third-party mail vendor with information about him, including his name, address, status as a debtor, and the amount of the alleged debt, which the vendor then used to generate and mail the letter to Plaintiff.  (Id. ¶¶ 19-20, 22-23, 26.)

Plaintiff commenced this action in state court in October 2021.  (Id. at 2.)  One month later, Defendant filed a notice of removal and an answer to the complaint.  (Doc. Nos. 1, 5.)  On February 22, 2022, Defendant filed its motion for judgment on the pleadings and a brief in support of the motion.  (Doc. Nos. 10-11.)  The parties stipulated to extend the deadline for Plaintiff's opposition papers (Doc. Nos. 12-13), which Plaintiff filed on March 15, 2022 (Doc. No. 14).  Defendant filed a reply brief the same month.  (Doc. No. 15.)  In June 2022, Plaintiff filed a notice of supplemental authority alerting the Court to the recent decision in Jackin v. Enhanced Recovery Co., LLC, No. 2:21-cv-00234, 2022 WL 2111337 (E.D. Wash. June 10, 2022).  (Doc. No. 16.)  Having been fully briefed, Defendant's motion is ripe for disposition.

## II.    THE FDCPA

The FDCPA was enacted to "protect consumers from unfair, abusive, and deceptive debt collection practices."  See Staub v. Harris, 626 F.2d 275, 276-77 (3d Cir.1980).  A debt collector who violates the FDCPA may be held liable for actual and statutory damages, as well as costs and attorney's fees.  See 15 U.S.C. § 1692k(a).  To plead an FDCPA claim, a plaintiff must allege four elements: "(1) [plaintiff] is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt."  See Douglass v. Convergent Outsourcing, 765 F.3d 299, 303 (3d Cir. 2014).

Relevant here, FDCPA § 1692c(b) prohibits, with exceptions, debt collectors from communicating with third parties about a consumer's debt, to wit:

> Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

See 15 U.S.C. § 1692c(b).  "The term 'communication' means the conveying of information regarding a debt directly or indirectly to any person through any medium."  Id. § 1692a(2).  "Debt" in this context "means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."  See id. § 1692a(5).

## III.   DISCUSSION

Although Defendant does not challenge Plaintiff's standing to press his claim, "federal courts 'have an obligation to assure [them]selves of litigants' standing under Article III.'"  See, e.g., Wayne Land & Min. Grp., LLC v. Delaware River Basin Comm'n, 959 F.3d 569, 574 (3d Cir. 2020) (alteration in original) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 340 (2006)).  That obligation is particularly significant in the context of Plaintiff's claim, which squarely raise the issue whether "a simple procedural violation of the FDCPA automatically establish[es] a concrete injury, thereby providing the basis for plaintiff to sue[.]"  See Barclift v. Keystone Credit Servs., LLC, No. 5:21-cv-04335, 2022 WL 444267, at *1 (E.D. Pa. Feb. 14, 2022).  Courts addressing FDCPA claims involving debt collectors' use of third-party mail vendors have therefore addressed standing sua sponte before deciding whether the claims state a viable cause of action.  See id.; Madlinger v. Enhanced Recovery Co., LLC, No. 21-cv-00154, 2022 WL 2442430, at *3 (D.N.J. July 5, 2022).  The Court will do the same here.

### A.      Legal Framework: Article III Standing

Article III of the United States Constitution limits the federal judicial power to the

adjudication of live cases or controversies.  See Common Cause of Pa. v. Pennsylvania, 558 F.3d

249, 257-58 (3d Cir. 2009) (citing U.S. Const. art. III, § 2).  The case-or-controversy requirement

"is satisfied only where a plaintiff has standing."  See id. at 258 (citing Sprint Commc'ns Co. v.

APCC Servs., Inc., 554 U.S. 269 (2008)).  A plaintiff does not have Article III standing unless:

(1) "the plaintiff . . . suffered a 'concrete,' 'particularized' injury-in-fact, which must be 'actual

or imminent, not conjectural or hypothetical'"; (2) the "injury [is] 'fairly traceable to the

challenged action of the defendant, and not the result of the independent action of some third

party not before the court'"; and (3) "a favorable decision likely would redress the injury."  See

Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3d Cir. 2009) (quoting Lujan v. Defs.

of Wildlife, 504 U.S. 555, 560 (1992)).

### B.      Origins of the Mail-Vendor Theory & Developing Case Law

The allegation that debt collectors violate § 1692c(b) of the FDCPA when they utilize

third-party mail vendors to send collection letters may originate from the Eleventh Circuit Court

of Appeals' holding in Hunstein v. Preferred Collection & Mgmt. Servs., Inc., 17 F.4th 1016

(11th Cir. 2021).  Hunstein brought suit arguing that a debt collector violated FDCPA § 1692c(b)

by transmitting personal information—including his name and outstanding balance, his son's

name, and "the fact that his debt resulted from his minor son's medical treatment"—to a

commercial mail vendor.  See id. at 1020.  The district court dismissed the action, but on appeal,

a panel of Eleventh Circuit judges concluded that Hunstein had Article III standing to press his

claims and that he stated a cause of action under § 1692c(b).  See id.  The panel reaffirmed its

holding upon rehearing, but a majority of Eleventh Circuit judges later vacated the panel's

opinion and sua sponte ordered an en banc rehearing.  See Hunstein v. Preferred Collection & Mgmt. Servs., Inc., 17 F.4th 1103 (11th Cir. 2021).  The en banc court heard oral argument earlier this year, but no decision has been issued.

With the Hunstein panel decision vacated, district courts have, with virtuality unanimity, declined to follow the panel's reasoning.  By and large, courts have concluded that a debt collector's use of a third-party mail vendor does not, without more, confer standing to pursue a claim for violations of § 1692c(b).  See Foley v. Medicredit, Inc., No. 2:11-cv-19764, 2022 WL 3020129, at *5 (D.N.J. July 29, 2022) (Shipp, J.); Ghazaly v. First Nat'l Collection Bureau, Inc., No. 5:21-cv-00362, 2022 WL 2610431, at *5 (E.D.N.C. July 8, 2022) (Flanagan, J.); Glick v. CMRE Fin. Servs., Inc., No. 21-cv-07456, 2022 WL 2475690, at *3 (S.D.N.Y. July 6, 2022) (Román, J.); Madlinger, 2022 WL 2442430, at *9 (Wolfson, J.); Stallworth v. Terrill Outsourcing Grp., LLC, No. 21-cv-04332, 2022 WL 1773778, at *3 (N.D. Ill. June 1, 2022) (Leinenweber, J.); Patni v. Resurgent Cap. Servs., L.P., No. 1:21-cv-02515, 2022 WL 1567069, at *2 (N.D. Ill. May 18, 2022) (Guzmán, J.); Devitt v. Portfolio Recovery Assocs., LLC, No. 21-cv-05657, 2022 WL 1460278, at *1 (E.D.N.Y. May 9, 2022) (Ross, J.); Rembert v. Am. Coradius Int'l, LLC, No. 22-cv-01093, 2022 WL 1211510, at *3 (N.D. Ill. Apr. 25, 2022) (Gettleman, J.); Weisz v. Sarma Collections, Inc., No. 21-cv-06230, 2022 WL 1173822, at *3 (S.D.N.Y. Apr. 20, 2022) (Halpern, J.); Barclift, 2022 WL 1102122, at *6 (Leeson, Jr., J.); Brown v. Alltran Fin., LP, No. 1:21-cv-00595, 2022 WL 377001, at *5-6 (M.D.N.C. Feb. 8, 2022) (Eagles, J.); Nabozny v. Optio Sols., LLC, No. 21-cv-00297, 2022 WL 293092, at *5 (W.D. Wis. Feb. 1, 2022) (Peterson, J.); Stewart v. Healthcare Revenue Recovery Grp., LLC, No. 3:20-cv-00679, 2022 WL 200371, at *17 (M.D. Tenn. Jan. 21, 2022) (Trauger, J.); Nyanjom v. NPAS Solutions, LLC, No. 21-cv-01171, 2022 WL 168222, at *6 (D. Kan. Jan. 19, 2022)

(Robinson, J.); Sputz v. Alltran Fin., LP, No. 21-cv-04663, 2021 WL 5772033, at *6 (S.D.N.Y.

Dec. 5, 2021) (Seibel, J.); Ciccone v. Cavalry Portfolio Servs., LLC, No. 21-cv-02428, 2021 WL

5591725, at *5 (E.D.N.Y. Nov. 29, 2021) (Seybert, J.); Shields v. Pro. Bureau of Collections of

Maryland, Inc., No. 2:20-cv-02205, 2021 WL 4806383, at *3 (D. Kan. Oct. 14, 2021) (Teeter,

J.); Keller v. Northstar Location Servs., No. 21-cv-03389, 2021 WL 3709183, at *2 (N.D. Ill.

Aug. 20, 2021) (Johnson, J.); Bush v. Optio Sols., LLC, 551 F. Supp. 3d 66, 70 (E.D.N.Y. 2021)

(Brown, J.).

> **C.      The TransUnion Opinion**

The above decisions were guided, in large if not whole part, by the United States

Supreme Court's exposition of Article III standing in TransUnion LLC v. Ramirez, 141 S. Ct.

2190 (2021), a Fair Credit Reporting Act ("FCRA") class action.  TransUnion had been using an

add-on product called OFAC Name Screen Alert to compare consumers' names, during an

ordinary credit check, to a list maintained by the Office of Foreign Assets Control.  See id. at

2201.  The list includes "specifically designated nationals who threaten America's national

security," e.g., terrorists and serious criminals.  See id.  If a consumer's name matched an

individual's name on the OFAC list, TransUnion "placed an alert on the credit report," flagging

the consumer as a potential match to a name on the list.  See id.  "Unsurprisingly, TransUnion's

Name Screen product generated many false positives[.]"  Id.  So it was with the plaintiffs in

TransUnion: they alleged that TransUnion placed OFAC alerts on their reports but failed to

"follow reasonable procedures to ensure the accuracy of credit files so that the files would not

include [misleading] OFAC alerts labeling [them] as potential terrorists[.]"  See id. at 2207.

TransUnion reached the Supreme Court on appeal from the Ninth Circuit Court of

Appeals.  The Ninth Circuit had held that all class members involved in the suit maintained

Article III standing to pursue their OFAC-related FCRA claims.  See id. at 2202.  Reversing, the Supreme Court clarified that some—but not all—class member plaintiffs had standing.  It held that class members whose credit reports (flagged with OFAC alerts) were disseminated to third-party creditors suffered a concrete harm sufficient to establish Article III standing.  See id. at 2212-13.  In contrast, class members whose reports were not so disseminated could not establish standing because TransUnion's mere inclusion of the OFAC alert in their reports did not give rise to a concrete harm.  See id. at 2212.

The Supreme Court's analysis in TransUnion, as reflected in its conclusions restated above, centered on the concreteness requirement of Article III standing.  To that end, Justice Kavanaugh began the Court's opinion with the following: "[t]o have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm.  No concrete harm, no standing."  See id. at 2200.  The Court explained that "physical, monetary, and other tangible harms readily qualify as concrete injuries under Article III" but that intangible harms—"reputational harms, disclosure of private information, and intrusion upon seclusion"—can also be concrete.  See id. at 2204.

The focus of Plaintiff's claim here, at least inasmuch as can be gleaned from his briefing, as his complaint alleges no injury,[2] is on the intangible harm of invasion of privacy.  Whether an intangible harm is adequately concrete, the Supreme Court explained in TransUnion, is guided by "history and tradition."  See id.  Courts must "assess whether the alleged injury to the plaintiff

---

[2] The closest the complaint comes to asserting an injury is where it references the general proposition that "[o]ne of the abusive debt collection practices the Act was designed to curb was 'invasions of individual privacy.'"  (Doc. No. 1-1 ¶ 14) (quoting 15 U.S.C. § 1692(a)).  Nowhere in the complaint is it specifically alleged that Defendant's use of a mail vendor invaded Plaintiff's privacy.  Plaintiff nevertheless makes several references to the harm of invasion of privacy in his briefing and therefore appears to base his claim on the contention that Defendant's conduct caused that harm.  See, e.g., (Doc. No. 14 at 49).

has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  See id.  In TransUnion, the Supreme Court held that injuries stemming from "publication to a third party of a credit report bearing a misleading OFAC alert bears a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation."  See id. at 2208. Thus, plaintiffs of the class whose credit reports were disseminated to third-party creditors suffered a concrete harm sufficient to confer standing.  See id. at 2209.  As to the remaining class members, however, "whose internal TransUnion credit files were not disseminated to third-party businesses," they "did not suffer a concrete harm."  See id. at 2212.

Certain principles laid out in the Supreme Court's opinion in TransUnion are particularly relevant in the context of FDCPA claims predicated on the mail-vendor theory.  First, in a now oft-quoted footnote, the Court (in dicta) spoke directly to "printing vendors":

> For the first time in this Court, the plaintiffs also argue that TransUnion "published" the class members' information internally—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received.  That new argument is forfeited.  In any event, it is unavailing. Many American courts did not traditionally recognize intra-company disclosures as actionable publications for purposes of the tort of defamation.  Nor have they necessarily recognized disclosures to printing vendors as actionable publications. Moreover, even the plaintiffs' cited cases require evidence that the defendant actually brought an idea to the perception of another and thus generally require evidence that the document was actually read and not merely processed.  That evidence is lacking here.

Id. at 2210 n.6 (emphasis added).  The Court concluded by explaining that "the plaintiffs' internal publication theory circumvents a fundamental requirement of an ordinary defamation claim—publication—and does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing."  See id.

Second, although Congress's views "may be 'instructive'" in "determining whether a

harm is sufficiently concrete to qualify as an injury in fact," Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." <u>See</u> <u>id.</u> at 2205 (first quoting <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 341 (2016); and then quoting <u>Hagy v. Demers & Adams</u>, 882 F.3d 616, 622 (6th Cir. 2018)).  The injury-in-fact requirement is not "automatically satisfie[d]" whenever "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." <u>See</u> <u>id.</u> (quoting <u>Spokeo</u>, 578 U.S. at 341).  Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." <u>See</u> <u>id.</u> (quoting <u>Spokeo</u>, 578 U.S. at 341).  Therefore, if Congress creates "a statutory prohibition or obligation and a cause of action," courts must still "independently decide whether a plaintiff has suffered a concrete harm under Article III[.]" <u>See</u> <u>id.</u> at 2205 ("[U]nder Article III, an injury in law is not an injury in fact.").

Third, although "plaintiffs [] [must] identif[y] a close historical or common-law analogue for their asserted injury," they need not identify an "exact duplicate in American history and tradition." <u>See</u> <u>id.</u> at 2204.  It was thus held in <u>TransUnion</u> that "the harm from being labeled a 'potential terrorist'" bears a sufficiently close "relationship to the harm from being labeled a 'terrorist'"—"[i]n other words, the harm from a misleading statement of this kind bears a sufficiently close relationship to the harm from a false and defamatory statement." <u>See</u> <u>id.</u> at 2209.  But the inquiry does not represent "an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." <u>See</u> <u>id.</u> at 2204.

The fourth particularly applicable aspect of <u>TransUnion</u> dealt with risks of future harm. After concluding that a majority of plaintiffs (those whose credit reports were never provided to third-party creditors) could not "demonstrate that the misleading information in the internal

credit files itself constitute[d] a concrete harm," the Supreme Court addressed their contention that "the existence of misleading OFAC alerts in their internal credit files exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm." See id. The Court rejected that argument, reasoning as follows:

> [The] plaintiffs [whose credit reports were never disseminated to a third party] did not demonstrate that the risk of future harm materialized—that is, that the inaccurate OFAC alerts in their internal TransUnion credit files were ever provided to third parties or caused a denial of credit. Nor did those plaintiffs present evidence that the class members were independently harmed by their exposure to the risk itself—that is, that they suffered some other injury (such as an emotional injury) from the mere risk that their credit reports would be provided to third-party businesses. Therefore, the 6,332 plaintiffs' argument for standing for their damages claims based on an asserted risk of future harm is unavailing.

See id. at 2211. The Court stressed that "there is a significant difference between (i) an actual harm that has occurred but is not readily quantifiable, as in cases of libel and slander per se, and (ii) a mere risk of future harm." See id.

### D.    Discussion

It is within this legal framework that the Court turns to the allegations advanced by Plaintiff here. As the Court observed, supra at n.2, Plaintiff does not allege injuries in his complaint—not reputational ones, not emotional ones, and not privacy-related ones. See (Doc. No. 1-1.) He simply seeks damages based on the fact that Defendant provided his information to the mail vendor. See (Doc. No. 14 at 34) ("Plaintiff's claim is premised on a violation of the plain text of the FDCPA."). In that way, he appears to maintain that Defendant's conduct per se injured him, conferred Article III standing, and therefore entitles him to statutory damages, fees, and costs. The Court disagrees.

TransUnion teaches that Congress's view of the scope of the FDCPA may be instructive but cannot alone establish Article III standing. Nor is Congress empowered to "enact an injury

into existence[.]"  See TransUnion, 141 S. Ct. at 2205 (quoting Hagy, 882 F.3d at 622).  Plaintiff

contends that because "invasion of privacy" is a "core concern animating the FDCPA," see

Douglass, 765 F.3d at 303, the dissemination of debt-related information—even to a mail vendor

for the sole purpose of sending out dunning letters—constitutes a per se actionable claim.

       That "core concern" about invasions of privacy, however, must be viewed in context.

The FDCPA's legislative history suggests that Congress was concerned not that debt collectors

would enlist mail vendors to shoulder the burden of sending dunning letters but rather that debt

collectors would "contact third persons such as a consumer's friends, neighbors, relatives, or

employer."  See S. Rep. No. 95-382, at 4 (1977).  Congress found that "[s]uch contacts are not

legitimate collection practices and result in serious invasions of privacy, as well as the loss of

jobs."  See id.  The statute was also rooted in more general concerns of collection abuse:

> Collection abuse takes many forms, including obscene or profane language, threats
> of violence, telephone calls at unreasonable hours, misrepresentation of a
> consumer's legal rights, disclosing a consumer's personal affairs to friends,
> neighbors, or an employer, obtaining information about a consumer through false
> pretense, impersonating public officials and attorneys, and simulating legal process.

See id. at 2.  Congress did not, of course, speak to the use of mail vendors.

       A holistic review of the FDCPA's legislative history therefore dispels the notion that

Congress's view on the FDCPA's scope is tantamount to an approval of the mail-vendor theory.

As aptly stated by the dissenting judge in the now-vacated Hunstein opinion, "[i]t seems odd that

Congress would hamper the very process it codifies in § 1692g, writing debtors about their debt,

by banning the use of mail vendors, who simply send out the written notices about debt, under

the language of § 1692c(b)."  See Hunstein, 17 F.4th at 1046 (Tjoflat, J., dissenting).  Even if the

Court were to assume that a debt collector violates the text of the FDCPA when it provides a

consumer's debt-related information to a mail vendor, nothing in the statute's legislative history

indicates that Congress intended for the statute to reach so far.  Indeed, in dismissing FDCPA mail-vendor claims for lack of standing, some courts have opined, without deciding, "that a debt collector's use of a mailing vendor to print and send collection letters to consumers is likely, at the least, a procedural violation of the FDCPA."  See, e.g., Barclift, 2022 WL 444267, at *7.  In sum, to the extent Congress's view is "instructive" as to the scope of the FDCPA, the legislative history does not suggest that Congress intended for plaintiffs to have standing to bring claims for procedural violations of the statute under a mail-vendor theory of liability.

Absent any indication from Congress that it intended to sanction the mail-vendor theory, the dispositive question in "assessing concreteness" becomes whether Plaintiff's "asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]"  See TransUnion, 141 S. Ct. at 2200 (quoting Spokeo, 578 U.S. at 341).  The only potential harm Plaintiff references in his complaint is the harm occasioned by an invasion of privacy, although he does not specifically allege that he was so harmed.  (Doc. No. 1-1 ¶ 14.)  Several courts have noted that the harm associated with FDCPA mail-vendor claims comes closest to "match[ing] the [harm implicated by a] privacy cause of action for public disclosure of private facts."  See Barclift, 2022 WL 444267, at *8 (citing Restatement (Second) of Torts § 652A (Am. Law Inst. 1977) ("Invasion of Privacy"));[3] accord Foley, 2022 WL 3020129, at *5

---

[3] Restatement (Second) of Torts § 652A(1) broadly provides that "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other[.]"  Section 652A(2), in turn, provides that one's right of privacy can be invaded under four different theories of liability: (1) intrusion upon the seclusion of another; (2) appropriation of the other's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) publicity that unreasonably places the other in a false light before the public.  Of these forms of invasion, the third—publicity given to private life—most closely resembles the harm alleged here.  To the extent the fourth form of invasion arguably resembles the harm here, that form of invasion also requires "publicity."  Because Plaintiff's allegations do not satisfy the publicity requirement, see infra, the Court need not separately analyze the fourth form of invasion, as the same conclusion would result, i.e., Plaintiff lacks Article III standing.

(noting that harm asserted in FDCPA mail-vendor claim closely resembles cause of action for public disclosure of private facts); <u>Devitt</u>, 2022 WL 1460278, at *6 (same); <u>cf.</u> <u>Stewart</u>, 2022 WL 200371, at *17 (finding tort of "invasion of privacy," which requires public disclosure of private facts, closely resembles harm in FDCPA mail-vendor action).

However, as its name suggests, the "public disclosure of private facts" cause of action requires "publicity."  Without publicity, Plaintiff cannot establish that he suffered the type of harm recognized by such a cause of action—and without that harm, Plaintiff has no common law analogue upon which to assert standing.  "Publicity" in this context means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  <u>See</u> Restatement (Second) of Torts § 652D cmt.  It depends on whether "a communication [] reaches, or is sure to reach, the public."  <u>See</u> <u>id.</u>  It is not "an invasion of the right of privacy" to "communicate a fact concerning [a] plaintiff's private life to a single person or even to a small group of persons."  <u>See</u> <u>id.</u>  Courts in this state, as in others, have accordingly found no publicity where information was disclosed on a limited basis.  <u>See, e.g.,</u> <u>Burger v. Blair Med. Assocs., Inc.</u>, 964 A.2d 374, 379 (Pa. 2009) (citing <u>Vogel v. W. T. Grant Co.</u>, 327 A.2d 133, 137 (Pa. 1974) (finding insufficient to "constitute publication" notifications provided to "three relatives and one employer" about an account)) (holding drug-use information disclosed to employer "not substantially certain to become public knowledge").

Application of these principles to the facts of this case compels the conclusion that Defendant's act in providing Plaintiff's information to a mail vendor, which then generated and mailed Plaintiff a dunning letter, is insufficient to establish publicity.  Plaintiff does not allege that his debt-related information "was made accessible to more than a single individual who

populated h[is] letter, let alone the broader public."  See Madlinger, 2022 WL 2442430, at *7

(citing Pagan v. Convergent Outsourcing, Inc., No. 21-cv-12130, at *1 (D.N.J. Mar. 30, 2022),

ECF No. 17 (rejecting FDCPA mail-vendor claim where it was not alleged that "anyone actually

read the[] information" rather "than merely processing it," or that the information was ever made

public "to any meaningful degree")); see also Glick, 2022 WL 2475690, at *3 (concluding that

disclosure of "medical debt to a third party does not rise to the level of publicizing [] private

information"); Rohl v. Pro. Fin. Co., Inc., No. 21-cv-17507, 2022 WL 1748244, at *3 (D.N.J.

May 31, 2022) (same).[4]  "Nor is disclosure to a third party vendor the sort of disclosure that is

certain—or even likely—to reach the public or anyone outside of [the mail vendor]."  Nabozny,

2022 WL 293092, at *2.  As one court put it, "[t]he harm of the tort [of publicity given to private

life] is not the mere fact of disclosure" but rather the fact that "private facts will become widely

known, or at least known by people with a close relationship to the plaintiff."  See id.  Plaintiff's

allegations do not satisfy this standard.

To be sure, the harm alleged by Plaintiff need not find "an exact duplicate in American

history," see TransUnion, 141 S. Ct. at 2204, but because Plaintiff does not claim publicity, any

alleged harm from Defendant's use of a mail vendor does not "bear a close enough relationship

to the tort of disclosure of private facts . . . ."  See Barclift, 2022 WL 444267, at *8; see also

Madlinger, 2022 WL 2442430, at *7.  Put differently, because the only arguably "close historical

or common-law analogue for [the] asserted injury"—public disclosure of private facts—bears an

---

[4] One court has noted that "the Supreme Court in TransUnion observed that disclosures to
printing vendors have not historically constituted 'publication' under defamation law, a much
lower bar than the 'publicity' required under an action for public disclosure of private facts."
See, e.g., Nyanjom, 2022 WL 168222, at *6 (citing In re FDCPA Mailing Vendor Cases, 551 F.
Supp. 3d 57, 64 (E.D.N.Y. 2021) (stating that footnote 6 of TransUnion appears to be
"dispositive of the mailing vendor theory")).

insufficiently close relationship to his claim, Plaintiff has not suffered a concrete injury and therefore lacks Article III standing to pursue relief under the FDCPA.  See id.; see also Nyanjom, 2022 WL 168222, at *5 (concluding that "sharing information about a debtor with a third-party letter vendor is not sufficiently analogous to an invasion of privacy"); Cavazzini v. MRS Assocs., No. 21-cv-05087, 2021 WL 5770273, at *5 (E.D.N.Y. Dec. 6, 2021) (same).  A debt collector that "outsources the mechanical tasks of preparing and mailing letters that the debt collector itself is authorized to send" simply "does not inflict any concrete injury on the debtor." See Nabozny, 2022 WL 293092, at *4.

Two final issues warrant mention.  First, Plaintiff does not allege a risk of future harm. But even if he did (e.g., by asserting that his debt-related information might be made public at some point), "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a separate concrete harm."  See TransUnion, 141 S. Ct. at 2210-11.  Many litigants pressing FDCPA mail-vendor claims "repeatedly invoke[] the specter of potential future release of information by the mailing vendor."  See In re FDCPA Mailing Vendor Cases, 551 F. Supp. 3d at 64.  Under TransUnion, however, "[s]uch speculative claims of potential future harm cannot support [a] claim of Article III standing."  See id.  Further, Plaintiff does not allege some separate concrete harm stemming from the risk of future harm.  Therefore, the possible risk of future harm does not suffice to confer standing on Plaintiff to pursue his FDCPA mail-vendor claim.

Second, the Court would be remiss not to acknowledge the few cases in which courts denied motions to dismiss FDCPA mail-vendor claims.  Two such cases, as Plaintiff points out (Doc. Nos. 14 at 12, 17), are Jackin, 2022 WL 2111337, and Khimmat v. Weltman, Weinberg & Reis Co., LPA, No. 2:21-cv-02944, 2022 WL 356561 (E.D. Pa. Feb. 7, 2022).  Another is Ali v.

Credit Corp. Sols., No. 21-cv-05790, 2022 WL 986166 (N.D. Ill. Mar. 30, 2022).  In none of those cases, however, did the court address the issue of standing.[5]  To be clear, the Court takes no position as to whether providing debt-related information to a mail vendor violates the strict letter of § 1692c(b).  The courts in Jackin, Khimmat, and Ali certainly did, and they ruled in favor of the plaintiffs, but in this Court's view, it would be improper to ignore the issue of Plaintiff's standing and the jurisdictional circumscriptions provided in Article III of the Constitution.  In short, because a debt collector's disclosure of a consumer's debt-related information to a mail vendor does not establish the type of harm associated with a close historical or common-law analogue, Plaintiff has suffered no concrete injury-in-fact.  He therefore lacks Article III standing to pursue his FDCPA claim here.

## IV.   LEAVE TO AMEND

By statute, district courts must "freely give leave [to amend] when justice so requires," see Fed. R. Civ. P. 15(a)(2), unless, among other circumstances, the plaintiff lacks standing and permitting amendment would be futile, see Christie v. President of U.S., 532 F. App'x 88, 89 (3d Cir. 2013) (not precedential) (citing In re New Jersey Title Ins. Litig., 683 F.3d 451, 462 (3d Cir. 2012)) (finding denial of leave to amend, upon dismissing for lack of standing, not an abuse of discretion where amendment would have been futile).

Plaintiff's claim here presents a novel theory of FDCPA liability that is particularly ill-suited for amendment.  His allegations make clear that he seeks to impose per se liability based

---

[5] The Court's research unearthed one case in which a district court found standing in an FDCPA mail-vendor claim.  That case is Keller v. Northstar Location Servs., No. 21-cv-03389, 2021 WL 3709183 (N.D. Ill. Aug. 20, 2021).  Keller was decided in August 2021, before Hunstein was vacated in November 2021, and was based on the reasoning and conclusions in Hunstein. Vacatur of Hunstein having cast doubt on the Eleventh Circuit panel's finding of standing, this Court declines to follow the reasoning of Keller.

solely on one act: Defendant's conduct in providing his information to a mail vendor for the purpose of sending him a dunning letter.  As the weight of authority suggests, there is no basis upon which Plaintiff can invoke Article III standing based on such a claim.  At best, Plaintiff could allege what he failed to allege in his complaint—that Defendant invaded his privacy by publicly disclosing his private information—but as the Court discusses above, such allegations do not give rise to Article III standing.  Granting leave to amend would therefore be futile. Accordingly, the Court will remand this case to the Susquehanna County Court of Common Pleas.  See Foley, 2022 WL 3020129, at *5 (remanding FDCPA mail-vendor case for lack of Article III standing); Devitt, 2022 WL 1460278, at *9 (same).

## V.        CONCLUSION

For the foregoing reasons, Plaintiff lacks Article III standing to pursue his claim in this Court.  As such, the Court will deny Defendant's Rule 12(c) motion for judgment on the pleadings (Doc. No. 10) as moot and remand this case to the Susquehanna County Court of Common Pleas.  An appropriate Order follows.